## M. A. FURBUSH & SON MACH. CO. et al. v. LIBERTY WOOLEN MILLS et al.

### (Circuit Court, W. D. Virginia. August 27, 1896.)

**1. STATUTORY LIENS—EMPLOYES' WAGES—PRIOR INCUMBRANCES.**

The prior lien, given by section 2485 of the Code of Virginia to the employés of transportation companies and mining and manufacturing companies, on all the real and personal property of such companies, and over which no mortgage, deed of trust, etc., can take precedence, attaches only to the interest in its property, acquired by the company which employed the claimants, and takes precedence only over mortgages, etc., made by it; and where such company has purchased property already subject to incumbrances made by the former owner, or has given a purchase-money mortgage, such incumbrances are not displaced by the employés' liens.

**2. PAYMENT—WHAT CONSTITUTES—MORTGAGES.**

The L. Co., part of whose property was mortgaged to F. & Sons, and which had issued $10,000 mortgage bonds, $4,400 of which were sold for value, and the remaining $5,600 were deposited as collateral for a note, sold its property to M. and others for a sum in cash, which, under the contract of sale, might be used, as far as it would go, to pay the debts of the L. Co. M. and his associates took up the note secured by $5,600 of bonds, and used the bonds, under an agreement with F. & Sons, as a payment on their mortgage. *Held*, that this transaction did not constitute a payment of the $5,600 bonds, nor extinguish them, nor postpone their lien under the mortgage to that of the remaining $4,400 of bonds.

On Exceptions to the Master's Report.

S. V. Southall, for complainants.

M. P. Burks, for defendants.

PAUL, District Judge. The Liberty Woolen Mills, a company incorporated under the laws of the state of Virginia, and a citizen of the state of Virginia, and having its principal office at Bedford City (formerly Liberty), within the Western district of Virginia, purchased of M. A. Furbush & Son, citizens of Philadelphia, in the state of Pennsylvania, certain machinery, fixtures, and supplies, for which the said company was indebted to said M. A. Furbush & Son in the sum of $14,813.77, as of the —— day of June, 1884. To secure the payment of this debt, the company executed a deed of trust on all the said machinery, fixtures, and supplies which it had purchased of M. A. Furbush & Son, in which deed it was provided that the title to the said machinery, etc., should remain in said M. A. Furbush & Son until all the purchase price thereof, interest, and insurance premiums had

been fully paid. Appended to the deed is a list of the machinery, etc., referred to. This deed of trust was duly recorded in accordance with the registry laws of Virginia, and bears date the 25th day of June, 1884. On the 1st day of June, 1885, the company executed coupon bonds to the amount of $10,000; and to secure the payment of the same, and of the coupons thereto attached, executed a mortgage on all its property, including its real estate situate in the town of Liberty (now Bedford City), the same being a lot of land containing 1.23 acres, together with the mill building, engine house, and all other improvements thereon, and machinery, tools, implements, furniture, and fixtures therein situated, acquired and to be acquired; also all personal property of said company of every kind and description, particularly all material for the product of said mills, whether raw wool or wool in the course of being manufactured, and all manufactured goods now in stock or hereafter produced. S. Griffin and M. P. Burks were made trustees in this deed, and the same was duly recorded, in accordance with the registry laws of Virginia, on June 11, 1885. Of the $10,000 of coupon bonds so executed and secured, $4,400 were issued to and taken by, and are now held by, the First National Bank of Bedford City, and the residue, to wit, $5,600, were hypothecated by the company with the People's National Bank of Lynchburg, to secure a loan. On April 4, 1889, the debt of the company to M. A. Furbush & Son had been reduced to $11,059.52, of which $9,878.99 was principal. On April 11, 1889, the stockholders of the company sold all the property, real and personal (the finished goods and office furniture excepted), to W. H. McGhee, T. D. Berry, S. M. Bolling, S. Griffin, and J. L. Campbell, for the sum of $17,000; these purchasers buying with notice of the debt, amounting to $11,059.52, due to M. A. Furbush & Son, and the lien on the machinery, etc., for its security, and of the $10,000 coupon bond mortgage on the entire property of the company; but it was agreed that, "of course, the purchasers have the privilege of using the purchase money, as far as it will go, in settling said mortgages." On the next day, to wit, on April 12, 1889, after the said purchase, an agreement was entered into between the said five purchasers and M. A. Furbush & Son, by which it was agreed that the $5,600 of the company's coupon bonds which had been hypothecated with the People's National Bank of Lynchburg, and which were then in the possession of the said bank as collateral for a loan of $————, should be redeemed by the said five purchasers, and turned over to M. A. Furbush & Son, and that M. A. Furbush & Son should receive said bonds, and credit the amount of the same, as of the day received, as a cash payment upon the debt due them. This was done as agreed, and the debt due M. A. Furbush & Son was thereby diminished by the amount of the said coupon bonds, leaving the amount of said debt, secured as aforesaid, $5,459.52. It was further agreed that the said five purchasers should execute their four bonds, payable to the company, for an amount equal to the residue of said debt due M. A. Furbush & Son, said bonds to be each in an equal amount, and payable, with interest, in four annual installments, and that said four bonds should be assigned by the company to M. A. Furbush & Son as collateral and additional security for the balance of their said debt left due after credit-

ing the said $5,600 of the company's coupon bonds as a cash payment upon said debt.    This was not done, however, but in lieu of it the said five purchasers, in an addendum to said agreement, guarantied to M. A. Furbush & Son the payment (as installed) of the said balance of the debt due them by the company.    On the 1st day of August following (1889) the said five purchasers turned over their purchase of the entire property and franchises of the Liberty Woolen Mills to the Liberty Woolen Manufacturing Company, a corporation organized under the laws of the state of Virginia, and the deed, recorded August 7, 1889, was made directly from the Liberty Woolen Mills to the Liberty Woolen Manufacturing Company, the said five purchasers joining in said deed.    On the 1st day of January, 1884, M. A. Furbush, C. A. Furbush, Charles H. Knowlton, and John Cronie associated themselves into a company, under the laws of the state of New Jersey, designated as M. A. Furbush & Son Machine Company; and it is stated in the bill, and proven by the deposition of Edwin C. Grice, the said agreement of April 12, 1889, between M. A. Furbush & Son and the said five purchasers of the property of the Liberty Woolen Mills, was made by said firm of M. A. Furbush & Son in trust for and for the sole and exclusive benefit of the said corporation, the M. A. Furbush & Son Machine Company, and that said corporation is also the owner and holder of the said $5,600 of the coupon bonds of the said Liberty Woolen Mills which were redeemed from the People's National Bank of Lynchburg by the said five purchasers, and turned over to M. A. Furbush & Son. The defendants file exceptions to the master's report on three distinct grounds, which the court will consider in the order in which they are presented.

1. All of the defendants except because the debt of the complainants for $4,201.97 is stated as the second lien on all of the property, whereas, in fact, it is a specific lien only on such of the property as was sold by complainants M. A. Furbush & Son to the Liberty Woolen Mills, and is not a lien on any of the real estate or other property of the defendants, or any of them.    The complainants have a specific lien for said sum of $4,201.97 on the machinery, fixtures, and supplies sold by M. A. Furbush & Son to the Liberty Woolen Mills, as shown by the mortgage of June 25, 1884, but they have no lien for said sum on any other property of the defendants.    This exception will be sustained.

2. The Liberty Perpetual Building & Loan Company, a creditor of the Liberty Woolen Manufacturing Company, excepts "because the commissioner has failed to state its debt proven in this cause as a lien on the property sought to be subjected in the bill.    It should be stated as the lien next after the taxes on all the real and personal estate in the bill and proceedings mentioned."    It further excepts "because the $5,600 of bonds held by the complainant is stated as part of the $10,000 mortgage in the bill and proceedings mentioned.    These bonds, if liens at all, are subsequent to the lien of this company.    The bonds were acquired by the complainants long after the passage of the Code of 1887, which gave the complainants full knowledge of the right of the laborers to claim liens on the property superior and paramount to deeds of trust, mortgages, etc.    In any view that could be taken of

the case, the debt of this defendant, if not a prior lien to the mortgage for $10,000, is a lien superior to any lien put on the property since the 1st day of May, 1888, under section 2485 of the Code." This exceptant, the Liberty Perpetual Building & Loan Company, is the holder of certain labor claims assigned to it by persons to whom the Liberty Woolen Manufacturing Company was indebted for work and labor done for said company. It is sought to give this debt priority over every lien reported by the master except the lien for $440 for taxes against the property. This priority, it is claimed, exists by reason of a provision of Code Va. 1887, § 2485, which is as follows:

"Sec. 2485. Lien of Employés, etc., of Transportation Companies, etc., on Franchises and Property of Company. All conductors, brakemen, engine drivers, firemen, captains, stewards, pilots, depot or office agents, storekeepers, mechanics, or laborers, and all persons furnishing necessary supplies to the operation of any railway, canal, or other transportation company, or of any mining or manufacturing company chartered under or by the laws of this state, or doing business within its limits, shall have a prior lien on the franchise, gross earnings, and on all the real and personal property of said company which is used in operating the same to the extent of the moneys due them by said company for such wages or supplies; and no mortgage, deed of trust, sale, hypothecation, or conveyance, executed since the twenty-first day of March, eighteen hundred and seventy-seven, shall defeat or take precedence over said lien: provided, that if any person entitled to a lien, as well under section twenty-four hundred and seventy-five as under this section, shall perfect his lien given by either section, he shall not be entitled to the benefit of the other."

This provision of the Code, were it the original, would, in the opinion of the court, be clearly null and void, because of its retroactive character, and its consequent impairment of the obligation of contracts. It is in conflict with section 10 of article 1 of the constitution of the United States. A very able and elaborate argument has been made by counsel for the assignee of these labor claims, to show that, though the provision of the Code (section 2485) might be null and void, yet the original act of the legislature, which is substantially the same as this provision of the Code, was passed March 21, 1877, and amended by act of April 2, 1879, and is valid. This court has passed upon the constitutionality of this act as to the wages due employés by manufacturing companies in Fidelity Insurance & Safe-Deposit Co. v. Shenandoah Iron Co., 42 Fed. 376. The court, after carefully considering the argument submitted in this case, finds no reason to change the view held by it in that decision. But a discussion of these questions seems scarcely necessary when we consider between what parties the contract was made out of which these claims grew, and against what property they are sought to be enforced, and out of what fund their payment is asked. This is a suit to foreclose two mortgages executed by the Liberty Woolen Mills, one dated on the 25th of June, 1884, and the other dated on the 1st day of June, 1885. In the year 1889 the mortgagor, the Liberty Woolen Mills, through its president and directors, sold the property at public auction, subject to these two mortgages, at the price of $17,000, with the privilege to the purchasers of using the purchase money, as far as it would go, in settling the mortgages. This was the consideration in the contract of sale between the vendor and vendees. The object of the sale was to realize a sufficient

sum to pay off the indebtedness of the Liberty Woolen Mills.  The purchase of the property by the vendees, with these mortgages on it, with the privilege of applying the said sum of $17,000, as far as it would go, to their payment, constituted, in equity, a vendor's lien on the property sold by the Liberty Woolen Mills to McGhee and four others.  While the property was thus held by these five purchasers, and before they had relieved it of the incumbrances on it by complying with their contract of purchase, another corporation, the Liberty Woolen Manufacturing Company, was formed, and McGhee and the other vendees sold the property to this new corporation on the same terms, the Liberty Woolen Mills and the five purchasers executing a deed jointly to the new purchaser, the Liberty Woolen Manufacturing Company.  This new company, in the course of its business, made contracts for labor and failed to pay the wages of its employés.  These employés, by pursuing the provisions of the statute, secured liens for their wages on the property of the Liberty Woolen Manufacturing Company, which liens the statute (section 2485) provides shall be a prior lien on the franchise, gross earnings, and on all the real and personal property of said company which is used in operating the same, to the extent of the money due them by said company for such wages; "and no mortgage, deed of trust, sale, hypothecation, or conveyance, executed since the twenty-first day of March, eighteen hundred and seventy-seven, shall defeat or take precedence over said lien."  The Liberty Woolen Manufacturing Company, which is the corporation for which the labor in this case was performed, has not executed on its property any mortgage, deed of trust, sale, hypothecation, or conveyance.  Should it execute a mortgage or other conveyance, nothing would pass by it except the interest the company might have in the property after satisfying the incumbrances thereon.  The interest it has in the property conveyed to it is what it took by purchase,—an equity of redemption.  This interest is subject to the labor liens.  The legislature has said that claims for wages shall be a prior lien on the franchise, gross earnings, and on all the real and personal property of said company.  The real and personal property of the Liberty Woolen Manufacturing Company consists of the interest it acquired by the conveyance of the 1st day of August, 1889, from the Liberty Woolen Mills and its vendees, McGhee and others, to the Liberty Woolen Manufacturing Company.

The contention here is that, no matter when or by whom a mortgage or deed of trust is executed on property held by a manufacturing company, such mortgage or deed of trust can be invaded by the statutory lien for wages, made subsequent thereto, and the creditor deprived of a security taken from an entirely different company from that contracting for the labor, and against which the labor claim is asserted.  This was not the intention of the legislature.  The destruction of property rights here contended for was not contemplated by the passage of the law for the protection of laborers.  In this state it is frequently the case, where a party sells land, instead of reserving a lien in the deed of conveyance, to secure the deferred payments of purchase money, he makes a conveyance with-

out such reservation, but contemporaneously takes from the purchaser a deed of trust on the property as security for the payment of the purchase money. If the purchaser of a tract of land should be a manufacturing company, and execute a deed of trust to secure the payment of the purchase money, according to the contention of counsel for the claimants of the labor liens in this case, the deed of trust so given would be subordinate to the security taken by the vendor for the payment of the purchase money for the land which he had sold to the manufacturing company. The simple statement of this proposition, it seems to the court, is a complete refutation of its correctness. Such gross wrong, in the deprivation of one man of his property in order to pay the debts of another, is contrary to every rule of right and justice known to the laws of this commonwealth, and cannot receive the sanction of this court. The exception will be overruled.

It is contended on the part of the First National Bank of Bedford City that the master erred in reporting as a lien $10,000, the amount of the coupon bonds issued by the Liberty Woolen Mills and secured by the mortgage of the 1st day of June, 1885. It is claimed that he should have reported $4,400 of bonds held by the First National Bank of Bedford City as constituting a lien under the mortgage on the whole plant of the Liberty Woolen Manufacturing Company, and that, if the $5,600 of coupon bonds held by the Furbush & Son Machine Company constitute a lien at all under said mortgage, it is a lien subordinate to that of the First National Bank of Bedford City for $4,400. The evidence shows that, at the time McGhee and others purchased the property of the Liberty Woolen Mills, $5,600 of the coupon bonds issued by this company, and secured by the mortgage of June 1, 1885, were held by the People's National Bank of Lynchburg, as collateral security for the payment of a debt due said bank by the Liberty Woolen Mills. It was stated in the argument that the five purchasers of the property, McGhee and others, or some of them, were indorsers on the note held by the bank for which the $5,600 of coupon bonds were deposited as collateral security. A witness, T. D. Berry, one of the five purchasers of the property, says they were deposited as a pledge to secure the payment of a debt due the bank. The five purchasers, McGhee and others, made an agreement April 12, 1889, with Furbush & Son that the said five purchasers would redeem the $5,600 of coupon bonds held by the People's National Bank of Lynchburg, and turn the same over to M. A. Furbush & Son, who were to credit the same as cash on their debt of $11,059.52, secured by the mortgage executed by the Liberty Woolen Mills, June 25, 1884. The Liberty Woolen Mills concurred in this agreement. The bonds were redeemed by the five purchasers paying the debt for which they were held by the bank as collateral security, and were delivered to M. A. Furbush & Son. The contention on the part of the First National Bank of Bedford City is that the five purchasers of the property of the Liberty Woolen Mills became, as between the Liberty Woolen Mills and themselves, primary debtors, and as between the holders of the coupon bonds and themselves they became sureties,

and that, when they redeemed these coupon bonds by paying off the debt for which the said bonds were held as collateral security, they were in the hands of those who were bound for their payment, and were therefore extinguished. The court cannot see that at the time these coupon bonds were redeemed by McGhee and the other purchasers they were bound for their payment, either as principals or sureties. Suppose the debt for which they were held as collateral security had not been paid off, and the bank had sold them as collateral security, can it be pretended that the purchaser of the coupon bonds could have proceeded against these five purchasers, either as primary or principal debtors, or as sureties? They could not have been held as either. If they were sureties for the debt due the bank by the Liberty Woolen Mills, which was not a lien upon the property, and they paid off the debt, they were entitled by subrogation to the collateral security held by the bank. The doctrine is thus stated in Pomeroy's Equity Jurisprudence (volume 3, § 1419):

"The surety who has paid or satisfied the principal's debt or obligation is entitled to be subrogated to, and to have the benefit of, all securities which may at any time have been put into the creditor's hands by the principal debtor, or which the creditor may have obtained from the principal debtor. By the fact of payment, the surety becomes an equitable assignee of all such securities, and is entitled to have them assigned and delivered up to him by the creditor, in order that he may enforce them for his own reimbursement and exoneration."

If McGhee and others, who paid off the debt due to the bank by the Liberty Woolen Mills, were not sureties thereon, then they were purchasers for value of the coupon bonds held as collateral security by the bank, and had a right to dispose of the same. This they did by paying off $5,600 of the mortgage held by Furbush & Son, and have received credit for this amount on the $17,000 of purchase money which they agreed to pay the Liberty Woolen Mills. The coupon bonds for $5,600, and the coupon bonds for $4,400, secured by the mortgage, occupy the same position as liens, and are properly so reported by the master.

3. "The defendants Griffin, Berry, McGhee, Bolling, and Campbell except because the commissioner has stated that there is a personal liability upon them, or any or either of them. The original purchase price of the property was $17,000, and whenever this amount is paid, either by the purchasers or by the sale of their property, there could, in the nature of things, be left no further liability on them. It is shown (on page 16 of the report) that $10,640.27 of this amount has been paid, and it is admitted that the property is liable for the residue, and is amply good for it. When this residue is paid there will be nothing due by the purchasers to the Liberty Woolen Mills, and it was error in the commissioner to state a possible liability for a deficiency which will never exist, as part of the assets of the Liberty Woolen Manufacturing Company." These defendants, Griffin and others, are properly credited by the master with the sum of $10,640.27 as the amount paid by them of the purchase money of $17,000. If, upon a sale of the property, the amount realized from such sale be not sufficient to pay off the liens which incumbered the

property at the time these purchasers purchased it, subject to these liens, then there will be a liability on the part of these purchasers to the Liberty Woolen Mills to an amount not exceeding the purchase price of $17,000, less the said amount of $10,640.27, which they have paid on account of said purchase price. The third exception is overruled.

The court cannot, at this time, fix the amount of the personal liability, if any, of the five purchasers of the property from the Liberty Woolen Mills, because it does not know what amount may be realized from the sale of the property. A decree will be entered directing the sale of the property, and the application of the proceeds to the payment of the liens as reported by the master, except so far as the said report is modified by the views of the court as herein stated.